Robert E. McGowan, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

George McGary, Jr., Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued May 8, 1981, before Judges MENCER, CRAIG and PALLADINO, sitting as a panel of three.

*Louie M. Ligouri,* with him *Ky Van Nguyen,* for petitioners.

*Francine Ostrovsky,* Assistant Attorney General, with her, *Elsa D. Newman-Silverstine,* Assistant Attorney General, *Richard Wagner,* Chief Counsel, and *Harvey Bartle, III,* Attorney General, for respondents.

OPINION BY JUDGE CRAIG, June 30, 1981:

Claimants George McGary, Jr. and Robert E. McGowan, unsuccessful in their application for unemployment compensation benefits, appeal from a board[1] order affirming the referee's conclusion that they were ineligible because they were guilty of willful misconduct.[2] Because the cases arose from the same series of events, we will treat the claimants' appeals jointly..

The claimants were employed by Consolidation Coal Company (employer). Claimant McGary, a union representative, and chairman of the mine com-

---

[1] Unemployment Compensation Board of Review.

[2] Section 402(e) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(e).

mittee, was a roof bolter; claimant McGowan, also a union representative, and chairman of the safety committee, was a bratticeman. Both were suspended with intent to discharge on May 21, 1979 for their actions in connection with a work stoppage which occurred at the mine site on May 18, 1979.

The stoppage was precipitated by the employer's refusal to pay a mine employee for two hours of work on May 17; the dispute centered on whether the employee was entitled to leave the mine early because his boots were wet inside.

In concluding that the claimants were ineligible for benefits under Section 402(e), the board found that each of the claimants "interfered with the management of the mine and through his own actions condoned, encouraged and instigated the work stoppage at approximately 8:00 a.m. on [May 18][3] which lasted through two shifts." The board also found that the claimants, as union representatives, had a duty under the collective bargaining agreement to persuade the other employees to cease the work stoppage.

Thus, we must resolve whether the claimants acted as the board found they did,[4] and whether those actions constitute willful misconduct as a matter of law.

---

[3] The board's findings and discussion erroneously state that the work stoppage occurred on May 17, 1979. The board admits the existence of this inaccuracy but argues that it has no effect upon the application of relevant legal principles and the ultimate resolution of the case, citing *Wetzel v. Unemployment Compensation Board of Review*, 29 Pa. Commonwealth Ct. 195, 370 A.2d 415 (1977). We must agree that the result in this case is not affected by the error.

[4] Where the party with the burden of proving willful misconduct has prevailed below, as here, our function on review is to determine if the findings are supported by substantial evidence. viewing the record in a light most favorable to that party. *Keefer v. Unemployment Compensation Board of Review*, 47 Pa. Commonwealth Ct. 281, 407 A.2d 934 (1979).

George McGary, Jr.
No. 151 C.D. 1980

Frank Cass, the foreman and acting superintendent, testified that on May 18, at the commencement of the 8:00 a.m. shift, a majority of the mine workers remained outside the mine after the buzzer sounded. The foreman testified that, upon ascertaining that the men were dissatisfied because the employee had not been paid, he explained to claimant McGary and the 100 or so employees present that the proper way to resolve the issue would be for the employee to file a grievance, as required by the collective bargaining agreement.

The foreman testified that McGary spoke up at that time, applied a vulgar label to him, and berated him in front of the men.[5] McGary also followed the foreman to his office and had further words with him about the situation.

The foreman stated that he returned to the hall and told the men to go to work, but that:

No one made a move, they just stood there and looked nobody answered or said a word.

. . . .

Q. Did anybody at this time ask you for a grievance form?

A. No, no one asked for a grievance form.

. . . .

Q. Then what happened?

A. The men put their lamps away and went back to the shower room . . . everyone left the premises.

---

[5] Concerning McGary's words and actions, the foreman stated: [H]e said act dumb you mother fucker that is the way you always do and I told George then that I didn't make it a habit of calling him names and I would appreciate it if he didn't call me names, and he pointed his finger at me and said well I called you one and I left and went back into the office.

McGary testified that, upon arriving at the mine site and being apprised of the situation, he told the other employees that they should go to work.[6] However, McGary admitted that he verbally berated the foreman, Cass.[7]

McGary now contends that the evidence does not support a finding that he encouraged or condoned the work stoppage, and that his actions were the result of being placed in an "involuntary situation." He argues that, in any event, his conduct was not in "wanton or willful disregard of the employer's interests," *MacFarlane v. Unemployment Compensation Board of Review,* 12 Pa. Commonwealth Ct. 550, 552, 317 A.2d 324, 325-26 (1974), such as to amount to willful misconduct.

In light of McGary's candid admissions concerning the confrontation with foreman Cass, the only controverted matter is whether his actions and speech contributed to the occurrence of the work stoppage.

---

[6] McGary testified:

I was trying to convince them that this was really a crazy reason for them to go on strike, I mean I said this over and over why give up 8 hours for 2 didn't make much sense and like I said the man would probably win the grievance . . . we were all trying to convince them to go to work. . . .

[7] McGary's testimony was:

[I] said you know what the trouble is and he said no I don't know what the trouble is and I said you mother fuckers started all of this stuff and then you come out here and act like you don't know what is going on because as far as I was concerned he was trying to make a fool of me in front of all of those people and I am out there trying my best to get them to go to work and he comes out and tries to belittle me in front of them.

Q. And you called him that in front of the other employees?

A. Yes, I mean that is normal everyday language in the coal mine and that is good language in the coal mine if you want to know the truth.

The referee and board chose to believe the employer's representatives' testimony over the conflicting testimony of McGary and his witnesses; we will not disturb that conclusion, in light of their recognized discretion to reach it. *Miller v. Unemployment Compensation Board of Review*, 45 Pa. Commonwealth Ct. 539, 405 A.2d 1034 (1979).

McGary's position as a union representative and mine committee chairman entailed the special responsibility of functioning as an advocate and liaison between the parties, rather than as an active participant in the dispute. McGary's argument that the incident placed him in an "involuntary situation" is negated by his uncompelled assumption of the union representative position and his election as chairman of the mine committee. Indeed, McGary testified that his primary duty as mine committee chairman was that of handling the filing and processing of all employee grievances. His failure to pursue that responsibility in this case is significant.

We therefore cannot agree with McGary's argument that his conduct did not amount to willful misconduct as a matter of law. Even though McGary may not have had a duty to encourage the men to cease the work stoppage,[8] we believe that his failure to follow established grievance procedures, coupled with his public exhibition and inciteful language in the midst of a tense labor situation, clearly manifested "an intentional and substantial disregard of the employer's interest [and] of [McGary's] duties and obligations to the employer," justifying disqualification from eligibility. (Emphasis deleted.) *MacFarlane, supra,* at

---

[8] The record does not establish that McGary had a positive duty to encourage his co-workers to return to their jobs. At most, the evidence establishes that McGary had a duty to file a grievance on behalf of the employee concerned; we believe that is a duty distinguishable from the one found to have existed by the board.

552, 317 A.2d at 325-26, *Moran v. Unemployment Compensation Board of Review*, 42 Pa. Commonwealth Ct. 195, 400 A.2d 257 (1979).

Robert E. McGowan
No. 150 C.D. 1980

Claimant Robert McGowan was also present when the workers remained outside the mine on May 18. The foreman testified that, when he asked what the problem was, McGowan told him that the men would begin working if the company paid the employee. The foreman stated that he felt that McGowan was giving him an ultimatum, especially because McGowan repeated the statement several times before the men dispersed.

Later in the afternoon, before the commencement of the 4:00 p.m. shift, the foreman testified that McGowan came to his office and "asked me if I had made up my mind yet whether I was going to pay the guy or not." When the foreman replied that they would discuss it after the men began working, claimant proceeded to the bathhouse to speak to the employees on the second shift, who were dressing for work. Ray Kocik, a mine employee who was in the bathhouse, testified that he could not hear the conversation, but that, after McGowan spoke with the men, they took off their work clothes and left the premises.

McGowan testified that, when he arrived at the mine site, the other employees asked him repeatedly what he was going to do about the situation. He insisted that he told the men at least three times that they should go to work, and that they should let the chairman of the mine committee, McGary, file a grievance. McGowan did admit telling foreman Cass "all you have to do is pay that man, and you know that these men will go into the mine. . . .", but said his statement was not meant as a threat.

McGowan further testified that his purpose in going to the bathhouse that afternoon was to explain to the second shift workers what had happened, and to try to talk them into going on the job. McGowan denied that he had ever encouraged the men to leave.[9]

Claimant McGowan makes the same arguments as those made by McGary in urging us to reverse the board.

The record here, as in McGary's case, lacks the necessary substantial evidence to support the board's conclusion that McGowan had a duty actively to encourage his co-workers to return to their jobs. As chairman of the safety committee, McGowan's only duty was that of acting as an intermediary between the employees and the employer for the alleviation of safety problems, not that of quashing work stoppages.

Most importantly, in McGowan's case, we find in the record no evidence whatsoever that McGowan abetted the work stoppage. Merely to relay to the foreman the men's prerequisite for their return to work, and later to ask the foreman if the aggrieved miner would be paid, did not amount to actions inciting the stoppage. Evidence that the men left the mine after McGowan spoke to them in the bathhouse, with nothing more, provides no support for an inference that McGowan contributed to their departure. Even if McGowan's own self-serving testimony is wholly disbelieved, there is no evidence to support the board's key finding that McGowan "condoned, encouraged and

---

[9] When asked if he knew why the men got undressed and left, McGowan stated:

No . . . after awhile when I came there, there was a few guys that came in, and here they started yelling and that and they said you know what we are doing here, we don't need to be here, daylight shift didn't work and that was it, that was while I was talking to different men and that and a lot of them were gone after that.

instigated the work stoppage''—a finding which, we note, the board applied to McGowan only through incorporation by reference from McGary's case, in which it was a finding expressed in full.

We therefore must affirm the board as to claimant McGary and reverse as to claimant McGowan.

### ORDER IN 151 C.D. 1980

AND Now, June 30, 1981, the order of the Unemployment Compensation Board of Review, dated December 21, 1979, No. B-178907, is affirmed.

---

### ORDER IN 150 C.D. 1980

AND Now, June 30, 1981, the order of the Unemployment Compensation Board of Review, dated December 21, 1979, No. B-178908, is reversed, and this case is remanded for computation of benefits.